[Cite as *C & K Indus. Servs. v. McIntyre, Kahn & Kruse Co., L.P.A.*, 2012-Ohio-5177.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 98096**

---

## C&K INDUSTRIAL SERVICES, ET AL.

PLAINTIFFS-APPELLANTS

vs.

## McINTYRE, KAHN & KRUSE CO., L.P.A.

DEFENDANT-APPELLEE

---

**JUDGMENT:**
REVERSED AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-551291

**BEFORE:** Cooney, P.J., Keough, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** November 8, 2012

**ATTORNEY FOR APPELLANTS**

Michael A. Partlow
112 South Water St., Suite C
Kent, OH 44240


**ATTORNEYS FOR APPELLEES**

**For McIntyre, Kahn & Kruse Co.**

Monica A. Sansalone
Colleen A. Mountcastle
Gallagher Sharp
Sixth Floor, Bulkley Building
1501 Euclid Avenue
Cleveland, OH 44115

Robert H. Eddy
Gallagher Sharp
420 Madison Avenue
Suite 1250
Toledo, OH 43604

**For Mark F. Kruse**

Mark F. Kruse, pro se
The Galleria & Towers at Erieview
1301 East Ninth Street
Suite 2200
Cleveland, OH 44114

COLLEEN CONWAY COONEY, P.J.:

{¶1}   Plaintiffs-appellants, C&K Industrial Services, Inc. and Karas Enterprises, Inc. (jointly "C&K"),[1] appeal the trial court's grant of summary judgment in favor of defendants-appellees Robert W. McIntyre ("McIntyre"), and McIntyre, Kahn & Kruse Co., L.P.A. ("MK&K") (collectively referred to as "appellees") on their legal malpractice claims.   We find merit to the appeal and reverse.

{¶2}   In January 2005, C&K filed suit against appellees alleging that they negligently represented its interests in an administrative expense claim in LTV Steel's Chapter 11 bankruptcy proceeding.   According to the complaint, C&K provided industrial cleaning services to LTV pursuant to a contract that provided a two-pronged structured method of compensation.   First, C&K was to be paid on an hourly basis for work and materials.   Second, C&K was to receive an additional amount based on the annual "savings" LTV received by virtue of the contract, which included low hourly rates.  This "Cost-Savings Incentive" was calculated by subtracting from a predetermined cap of maximum expenditures for cleaning services the actual costs C&K charged LTV for its work.   C&K and LTV split 50/50 any savings realized after the first $200,000 saved.

---

[1]   Karas Enterprises is a nominal plaintiff.   According to the complaint, Arthur Karas is a principal of C&K.   Karas Enterprises paid fees on behalf of C&K and, in effect, acted as an agent of C&K.   Therefore, we refer to appellants collectively as C&K.

**{¶3}** LTV filed for bankruptcy in December 2000. On the advice of counsel, C&K continued to provide LTV with services pursuant to the contract. Meanwhile, C&K, through appellees, filed an administrative expense claim against LTV in the bankruptcy court alleging it was owed $1,899,064.23 for post-petition industrial cleaning services provided pursuant to the contract. C&K further alleged that the total claim was composed of two "Efficiency Bonuses": (1) $606,706 for the fiscal year May 1, 2000 – May1, 2001; and (2) $840,997.52 for the period May 1, 2001 – May 1, 2002.

**{¶4}** C&K justified the "Efficiency Bonuses" by arguing that its base prices on the contract were lower than the prices they charged other customers. They further claimed that the negotiated hourly rate was significantly lower than it would have been without the Savings Incentive. They claimed the two methods of compensation combined to form a single compensation package in exchange for C&K's services.

**{¶5}** LTV sought discovery on this issue. On appellees' advice, C&K did not provide discovery of their third-party price databases and provided only summaries of the information. Unbeknownst to C&K, the parties contested this discovery issue, and LTV finally filed a motion to dismiss C&K's claim. The bankruptcy court denied the motion but sanctioned C&K by prohibiting it from offering any evidence of third-party price rates at the hearing on its claim, and from making any argument that LTV received favorable rates. In its decision, the bankruptcy court stated:

> The ground shifting tactics of C&K demonstrate willfulness and bad faith. This was not a case of accidental or inadvertent noncompliance. C&K consciously and intentionally failed to adequately respond to LTV's discovery requests. By constantly shifting ground, C&K assured itself that

it would not have to respond to LTV's requests since it always had a fresh excuse as to why it need not comply. LTV was forced to wrestle a cloud.

*In re LTV Steel Co., Inc.*, 307 B.R. 37 (Bankr.N.D.Ohio 2004).

**{¶6}** The bankruptcy court also precluded C&K from presenting expert testimony on the fair market value of C&K's cleaning services because C&K's counsel failed to identify an expert for more than a year after the discovery deadline. The court found that late submission of expert testimony would have precluded LTV from conducting discovery sufficient to rebut the expert's testimony. It further held that LTV's other creditors lacked the "resources and obligations to continue this charade for the benefit of one creditor." *Id.* at 47.

**{¶7}** C&K subsequently discharged appellees and retained other counsel to litigate its claim. Nevertheless, the bankruptcy court ultimately rejected C&K's administrative expense claim on the grounds that C&K failed to meet its burden under 11 U.S.C. 503(b)(1)(A) of the Bankruptcy Code. The bankruptcy court found that LTV's own evidence established that the "savings incentive did not directly and substantially benefit the estate" as required under 11 U.S.C. 503(b)(1)(A) to recover an administrative claim expense.

**{¶8}** 11 U.S.C. 503(b)(1)(A), which sets forth the basis for an award of an administrative expense claim, provides:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under 502(f) of this title, including –

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

**{¶9}** A debt qualifies as an "actual, necessary" administrative expense only if (1) it arose from a transaction with the bankruptcy estate, and (2) directly and substantially benefitted the estate. *Pension Benefit Guar. Corp. v. Sunarhauserman, Inc.*, 126 F.3d 811, 816 (6th Cir.1997), citing *Emp. Transfer Corp. v. Grigsby* (*In re White Motor Corp.*), 831 F.2d 106, 110 (6th Cir.1987). This "benefit to the estate test" limits administrative claims to those where the consideration for the claim was received during the post-petition period. *Id.*

**{¶10}** In the complaint, C&K raised three grounds supporting its legal malpractice claim. First, C&K alleged that appellees did not competently represent its interests when they engaged in abusive discovery practices thereby causing C&K to lose its ability to prove its administrative expense claim. Second, it alleged that appellees breached a duty of care owed to C&K by failing to advise C&K of its legal options with respect to its contract with LTV once LTV went bankrupt. On the advice of counsel, C&K continued working under the contract and assumed the risk that it might not be paid. Third, it claimed that appellees breached their oral contract with C&K to provide it with competent legal counsel.

**{¶11}** Appellees answered and counterclaimed for their fees and expenses, asserting causes of action on an account, breach of contract, and unjust enrichment. Appellees also filed a motion for judgment on the pleadings, asserting that C&K's claims

were barred by collateral estoppel. The trial court granted the motion and C&K appealed. This court reversed the trial court's decision, finding that judgment on the pleadings was not warranted and that a motion for judgment on the pleadings, unlike a motion to dismiss, could not be converted into a motion for summary judgment "when matters outside the pleadings are submitted." *C&K Industries, Inc. v. McIntyre, Kahn & Kruse*, 8th Dist. No. 92233, 2009-Ohio-2373, ¶ 11-12. Appellees had improperly attached the federal court opinion to their motion, not as legal authority, but as evidence that the issues raised in the complaint were conclusively decided against C&K in the prior litigation. *Id.*

**{¶12}** On remand, appellees filed a motion for summary judgment and attached certified copies of the opinions and orders from both the bankruptcy court and the federal district court, where the bankruptcy appeal was heard. As before, appellees argued that C&K's malpractice claims were barred by collateral estoppel and because they could not prove the proximate cause element of their claims. The trial court granted the motion. C&K now appeals, raising two assignments of error.

<u>Standard of Review</u>

**{¶13}** An appellate court reviews a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can

come to but one conclusion, that conclusion being adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998), citing *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196 (1995), paragraph three of the syllabus.

The Discovery Sanction

{¶14} In its first assignment of error, C&K argues the trial court erred in granting summary judgment to appellees. C&K contends that appellees' failure to respond to LTV's discovery requests proximately caused C&K to lose its administrative expense claim against the bankrupt LTV estate.

{¶15} To establish a cause of action for legal malpractice, a claimant must demonstrate the existence of an attorney-client relationship giving rise to a duty, a breach of that duty, and damages proximately caused by that breach. *Vahila v. Hall*, 77 Ohio St.3d 421, 1997-Ohio-259, 674 N.E.2d 1164, syllabus. "If a plaintiff fails to establish a genuine issue of material fact as to any of the elements, [the attorney] is entitled to summary judgment." *Shoemaker v. Gindlesberger*, 118 Ohio St.3d 226, 2008-Ohio-2012, 887 N.E.2d 1167, ¶ 8.

{¶16} The merits of the malpractice action often depend on the merits of the underlying case when proximate cause is an issue. As such, a plaintiff in a legal malpractice action may be required to demonstrate the merits of the underlying claim. *Eastminster Presbytery v. Stark & Knoll*, 9th Dist. No. 25623, 2012-Ohio-900, ¶ 6, citing *Vahila* at 427-428. Although the Ohio Supreme Court has held that the

"case-within-a-case" doctrine does not apply to every legal malpractice case, *Vahila* at 428, it remains relevant in cases where "the theory of the malpractice case places the merits of the underlying litigation directly at issue." *Eastminster* at ¶ 7, quoting *Environmental Network Corp. v. Goodman Weiss Miller, L.L.P.,* 119 Ohio St.3d 209, 2008-Ohio-3833, 893 N.E.2d 173, ¶ 18. In order to prove causation in these cases, the plaintiff must prove that but for the attorney's negligence, the plaintiff would have obtained a better outcome in the underlying case. *Eastminster* at ¶ 7, citing *Environmental Network* at ¶ 18. In this way,

> All the issues that would have been litigated in the previous action are litigated between the plaintiff and the plaintiff's former lawyer, with the latter taking the place and bearing the burdens that properly would have fallen on the defendant in the original action. Similarly, the plaintiff bears the burden the plaintiff would have borne in the original trial[.]

*Id*., quoting Restatement of the Law 3d, Law Governing Lawyers 390, Section 53, Comment b (2000).

**{¶17}** The trial court's order granting summary judgment gave no basis for its decision. Appellees argued that collateral estoppel barred C&K's claim that the discovery sanction prevented it from proving its administrative expense claim. C&K argues that collateral estoppel is inapplicable under the facts of this case.

**{¶18}** Collateral estoppel, also referred to as the doctrine of issue preclusion, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the

cause of action in the two actions be identical or different. *Fort Frye Teachers Assn., OEA/NEA v. State Emp. Relations Bd.*, 81 Ohio St.3d 392, 395, 1998-Ohio-435, 692 N.E.2d 140, citing *Norwood v. McDonald*, 142 Ohio St. 299, 52 N.E.2d 67 (1943).

{¶19} In *State v. Williams*, 76 Ohio St.3d 290, 1996-Ohio-408, 667 N.E.2d 932, the Ohio Supreme Court explained that there are exceptions to the collateral estoppel doctrine and that relitigation of the issue in a subsequent action between the parties is not precluded in certain circumstances. *Id.* at 295. The *Williams* court identified several exceptions including situations where "'the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action.'" *Id.*, quoting 1 Restatement of the Law 2d, Judgments (1980) 273-274, Section 28.

{¶20} C&K argues that because the discovery sanction prevented it from obtaining a full and fair adjudication of its administrative expense claim, collateral estoppel is inapplicable. To determine whether collateral estoppel applies, we must conduct an independent review of the federal court decisions to determine whether C&K was deprived of a full and fair adjudication. Such an analysis is inextricably intertwined with a determination of the proximate cause element of C&K's legal malpractice claim.

{¶21} As previously mentioned, C&K's contract with LTV provided that C&K would be compensated with two types of payments: (1) a specified hourly "time and material" rate for workers and equipment, and (2) an annual "Savings Incentive" payment defined as a portion of the "savings" on cleaning costs LTV received by having C&K

perform all its cleaning operations, calculated by taking 50% of the difference (after the first $200,000) between C&K's total charges during the fiscal year and a negotiated "Expenditure Limit." The annual payment was referred to as a "Cost-Savings Incentive" or "Efficiency Bonus." The Expenditure Limit provision, as cited in the bankruptcy court opinion, provides in pertinent part:

> The quantities listed in the request to determine the expenditure limit where [sic] in error. For example, C&K used more 20,000-psi waterblasters than listed (164 verse 20 hours). Therefore, C&K knowing the speed LTV desires to proceed with this proposed order and not desiring to quibble quantities, C&K proposes to use *$5,700,000 as the maximum allowable* expenditure limit. This reflects an *immediate 15% savings* for LTV based on the information provided to C&K.

(Emphasis in original.)

{¶22} The expenditure limit was originally set as follows: $5,500,000 for year one of the contract, $5,225,000 for year two, $4,963,750 for year three, $4,715,562 for year four, and $4,479,783 for year five. The parties adjusted the expenditure limit after the first year of the contract because LTV closed Finishing Plant No. 2. The parties lowered the expenditure limit for subsequent contract years by $80,000.

{¶23} It is undisputed that LTV paid C&K the full amount LTV owed under the hourly "time and materials" rate portion of the contract. LTV conceded in the bankruptcy court that C&K is entitled to have $411,891 of its Saving Incentive receive administrative priority. However, LTV also admitted that this calculation did not address whether this amount benefitted the estate or whether it was earned by C&K.

**{¶24}** Administrative expenses are defined in the Bankruptcy Code as "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. 503(b)(1). Generally, claims for administrative expenses under section 503(b) are narrowly construed to maximize the value of the estate for all creditors. *In re Federated Dept. Stores, Inc.*, 270 F.3d 994, 1000 (6th Cir.2001). "'[A] debt qualifies as an "actual, necessary" administrative expense only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate.'" *In re Eagle-Picher Industries, Inc.*, 447 F.3d 461, 464 (6th Cir.2006), quoting *Pension Benefit Guar. Corp.*, 126 F.3d at 816.

**{¶25}** Further, the terms "actual" and "necessary" must be narrowly construed, i.e., the administrative expenses must be actual and necessary costs of preserving the estate for the benefit of its creditors. *NLRB v. Walsh (In re Palau Corp.)*, 18 F.3d at 746, 750 (9th Cir.1994). The party seeking the priority "has the burden of proving that his claim constitutes an administrative expense." *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 226 (6th Cir.2009), citing *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir.1987).

**{¶26}** In denying C&K's administrative expense claim, the bankruptcy court found that C&K failed to meet its burden of proving that the Savings Incentive benefitted the estate in any way. Arthur Karas, president of C&K, testified in the bankruptcy proceeding that the hourly rates were lower than the rates under a 1996 contract between C&K and LTV because the current agreement included the Savings Incentive element that induced him to lower his prices. However, the bankruptcy court did not find this

statement credible, explaining: "It is likely that providing bulk cleanout services is more cost effective" for LTV and "receiving all the work is beneficial" to C&K.

{¶27} Evidence of third-party pricing or market pricing may have bolstered Karas's credibility. Nevertheless, the bankruptcy court also determined that the savings LTV experienced for cleaning services was a result of reduced production of steel and not due to C&K's efficiency. As cited above, the Expenditure Limit provision in the contract allowed LTV to lower the expenditure "cap" to "reflect events affecting the costs of typical vacuuming, water blasting and street sweeping service work." Commenting on this provision, the bankruptcy court stated:

> The ordinary meaning of this section of the contract compels the conclusion that the expenditure limit could be adjusted for a slowdown of the magnitude LTV experienced before and after the filing for bankruptcy. First, the permanent slowdown was "affecting the cost" of the services listed in the Contract. *   *   * The intent of the "Expenditure Limit" section is clear. It was designed to prevent either party from receiving a windfall due to events outside the parties' control. The slowdown experienced by LTV is such an event and, thus, operates to reduce the cap.

{¶28} As LTV's production slowed, its need for cleaning services diminished. C&K worked less and billed less in the hourly rate portion of the contract. As a result, the "savings" were artificially inflated. Without reducing the cap, the savings would have been enormous even though C&K's work was greatly reduced. The Efficiency Bonus would have been disproportionate to any actual benefit LTV obtained. For this reason, we agree with the conclusions reached by both the bankruptcy and federal district courts that this expense did not benefit the estate. Rather, it would have benefitted C&K, which would have received a windfall at the expense of LTV's other creditors.

Therefore, even if C&K had been permitted to introduce evidence of third-party pricing, this evidence would have been irrelevant in the context of LTV's bankruptcy.

{¶29} Moreover, despite C&K's arguments to the contrary, the Cost-Savings Incentive was a bonus, the amount of which was contingent on both C&K's performance and the amount of the expenditure limit. The less C&K charged for its hourly work and equipment, the larger the cost savings would be. The smaller the expenditure limit, the less the amount remaining after subtracting C&K's hourly bill and the $200,000 provided in the contract. Under these circumstances, the savings incentive was neither a fixed amount nor was it necessarily an automatic component of the contract.

{¶30} Bankruptcy courts do not permit incentive "bonus" payments, no matter how phrased, because they cannot be classified as administrative priority expenses. Contingent costs and expenses are rejected under 11 U.S.C. 503(b) because they do not constitute "*actual*, necessary costs" of preserving the bankrupt estate. *In re Hemingway Transport, Inc*., 993 F.2d 915, 930 (1st Cir.1993).

{¶31} Further, the "benefit" requirement of section 503(b) is difficult to satisfy because the benefit must be "substantial" and "direct." *In re White Motor Corp*., 831 F.2d 106 (6th Cir.). Undoubtedly, LTV could have benefitted from the structured compensation in the contract that included the Savings Incentive provision. However, the evidence presented in the bankruptcy court showed that the benefit was significantly diminished by virtue of LTV's precipitous slowdown in business. As a result, the benefit

was neither direct nor substantial and therefore not an "actual, necessary" expense entitled to payment under section 503(b).

{¶32} Under these circumstances, we find that C&K cannot establish that appellees' conduct in the bankruptcy proceeding proximately caused C&K to lose its administrative expense claim. Accordingly, we overrule the first assignment of error.

## Legal Advice

{¶33} In the second assignment of error, C&K argues the trial court erred in granting summary judgment on its second theory of malpractice involving appellees' failure to advise C&K that it could renegotiate its contract with LTV once LTV entered bankruptcy. Had a new contract been negotiated, C&K could have received a higher hourly and equipment rate and deleted the "Cost-Savings Incentive."

{¶34} In support of this argument, C&K presented an expert affidavit. To overcome summary judgment in a legal malpractice case, the plaintiff must present proof of professional negligence through expert testimony. *McInnis v. Hyatt Legal Clinics,* 10 Ohio St.3d 112, 113, 461 N.E.2d 1295 (1984). C&K's expert, attorney Mark Schlachet ("Schlachet"), specifically identified what he calls three "independent grounds" of alleged malpractice including: "failing to properly advise [C&K] how to protect its interests under the contract with the bankrupt LTV, on a going forward basis." (Schlachet affidavit ¶ 12.)

{¶35} Appellees failed to provide any expert evidence in support of their motion for summary judgment. Once C&K presented expert evidence in support of its claim in

its brief in opposition to the motion for summary judgment, appellees attacked the expert affidavit, arguing it failed to satisfy the requirements set forth in Evid.R. 703 and 705 because it did not disclose the underlying facts or data used. Appellees continue to argue the insufficiency of C&K's expert testimony on appeal.

**{¶36}** Evid.R. 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert *or admitted in evidence* at the hearing." (Emphasis added.) Evid.R. 705 permits an expert to "testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data * * * in response to a hypothetical question or otherwise." *See also Nu-Trend Homes, Inc. v. Law Offices of DeLibera, Lyons & Bibbo*, 10th Dist. No. 01AP-1137, 2003-Ohio-1633, ¶ 50, citing *C.R. Withem Ent. v. Maley*, 5th Dist. No. 01 CA 54, 2002-Ohio-5056, ¶ 34.

**{¶37}** Schlachet's expert opinion that appellees negligently failed to advise C&K that it could renegotiate its contract with LTV is factually supported both in the record and in his affidavit. It is clear from the affidavit that LTV went into bankruptcy and that C&K continued to operate under the same contract it negotiated prior to LTV's bankruptcy. In his opinion, as an expert in bankruptcy law, Schlachet believed appellees should have advised C&K to renegotiate its contract with LTV to protect its interests. Schlachet stated that the hourly and equipment rates in its contract were below the market rate and below rates it charged its other customers because it intended to recoup the difference through the Savings Incentive portion of the contract. C&K's interests under

this arrangement were jeopardized by LTV's bankruptcy because the Savings Incentive might not get paid, as indeed it was not. The facts necessary to support this opinion are few and uncomplicated. They are contained both in the record as permitted by Evid.R. 703 and incorporated in Schlachet's affidavit. Therefore, Schlachet's affidavit satisfies the requirements of Evid.R. 703 and 705 on this issue.

{¶38} Appellees also argue that the judgments of the bankruptcy court and federal district court found independent factual and legal grounds for denying C&K's administrative claim and that those judgments cannot be contradicted or negated by any expert affidavit. We agree. But those judgments and opinions do not discuss and have no bearing on whether appellees should have advised C&K to renegotiate its contract with LTV to obtain a higher hourly rate for services that would have benefitted the bankruptcy estate.

{¶39} Schlachet's uncontroverted affidavit creates a genuine issue as to whether appellees' failure to discuss C&K's legal options with respect to its contract with LTV after LTV entered bankruptcy proximately harmed C&K's financial interests. Therefore, summary judgment is reversed on this theory of C&K's malpractice claim.

{¶40} Accordingly, the second assignment of error is sustained.

{¶41} Judgment reversed and case remanded to vacate summary judgment in part.

It is ordered that appellants recover of said appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
COLLEEN CONWAY COONEY, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
EILEEN A. GALLAGHER, J., CONCUR